Vassal of the United States of America, the President of the United States of America, the President of the United States of America, the President of the United States of America,    the President of the United States of America, has been substantially burdened or burdened in violation of this section, may assert this violation as a claim or defense in a judicial proceeding. The title specifically anticipates judicial remedies and exceptions to rules of general application, and I'll come back to that. In this case, the title specifically sets forth that the government shall not substantially burden a person's exercise of religion and sets forth the exception for when they are allowed to do that, and there are two requirements, and both must be met. It's our position that the government must establish both of the following, that the restriction or impediment is in furtherance of a compelling government interest and that it's the least restrictive means of furthering that interest. This challenge was made and denied in the district court, and the district court appeared reluctant to deny the motion, saying in the record that it was a difficult issue, he felt bound by Antoine, and that he saw really this case as a speed bump on the way to the Ninth Circuit, bearing further appellate review, that it might require further appellate review. Our position is that district court judges' denial was erroneous in both parts of the RFRA test. The standard here on de novo review is one that would allow the court to find for us, on both grounds, that criminalizing these appellants' possession of these feathers was not in furtherance of a compelling government interest and that the criminal charges were not the least restrictive means. It's your position, as I understand it, that to the extent our decision in, and I don't know if it's Antoine, Antoine or however you pronounce it. I just had that discussion. Yeah, the A case, that the compelling government interest was at that time recognized to be the preservation of the species, the bald and golden eagle, and that in light of all this scientific evidence that you presented to the district court, along with the delisting, that that interest is no longer compelling. Is that it? Absolutely. Antoine even invited, we think, a decision that we're asking for, saying that at that time the evidence that was before the court, which was the 1999 proposal to delist, and contained a lot of scientific evidence even at that time that the bird was having this incredible rebound. Well, in some areas. I mean, one of the things that bothered me about the chart was it showed that in Nevada, for example, there are only three nesting pairs. I mean, we're writing law here for the entire Ninth Circuit. I'm less concerned about Alaska than I am about Nevada. So how do we address that problem? Well, I think there's a lot of reasons why the birds may nest in one place and not another, and I don't profess to be an expert on this. All of the experts seem to agree that DDT was the cause of the devastating decline. I don't know what the difference was in Nevada on the DDT on the bird eggs as opposed to anyplace else, but we also know that a lot of what's happening with the birds has to do with habitat and change and land use and things. Well, my question is not so much about whether it's a good idea to protect eagles, but whether it's a good idea for this court to change the law if Antoine invited a change in the law. Isn't that usually done by the legislative branches, rather, or by the executive branch and their multitude of executive regulations and so forth? But courts, just because we think it's perhaps that the eagles are coming back, we can now change the law from Antoine or Antony. What do you say about that? I don't see it as needing a legislative change because the RFRA already has in it the test, which requires a substantial compelling interest in least restrictive means and specifically gives license for there to be exceptions judicially found. The case law is consistent with that. And Ocentro, I think, gives renewed vitality to that idea that courts will have to struggle with this balancing. In my view, it's not a change in the statute at all, but one in which the courts and you, I hope, can find that an exception can be made for these two appellants. But if these two, they're not members of a tribe that's regulated or that's certified or whatever, so they have to be qualified defendants in a way. And these could anybody, anybody from anywhere who had never seen an eagle in his life but was a good shot with a rifle and bringing down soaring birds could go into the eagle feather business and say, well, I'm religious. But the government says, no, you have to be a member of a tribe that is recognized as having that religious thing about eagles. Well, what we're saying the remedy ought to be is not to change the killing or taking or destruction of nests. Those are all protections that remain in place and are unaffected by our case. What we're saying is that these two appellants easily meet a test which is very similar to the test already required by the permitting system. So it's one that is easily applied. But why should it make any difference? If your argument is that the species have recovered sufficiently so that they don't need protection anymore, then what difference does it make whether they get the feathers from a repository, find them in the woods, or shoot them out of the trees and pluck them off the carcasses? Well, the difference for this case is that I don't need the court to go that far for it. Well, but we have to write an opinion. Understood. So how do we write that opinion that carves out this exception for these two people and doesn't open the floodgates for my next-door neighbor with the shotgun? First of all, I don't think there's evidence in the record that there would be floodgates or that I don't think that the government established a record that there would be so many people actually doing this. The evidence that I think appears clear is that there's millions of Native Americans, very few of them, even on recognized lists, actually ever apply or seek feathers. So even from a very, very large group of people who are on the tribal list that are recognized, very few are seeking feathers. But you want access to the repository, do you not? Well, there's two ways that it could be done. It seems to me that the court could allow an exception finding vacating the conviction for these two and allow them to have the feathers that they had come into possession of. Without a permit. Without a permit. Without a permit, or it seems like it would be an easy remedy to require registration of someone who is a religious practitioner, who could establish sincere religious practice, who could establish that they came into possessions of feathers from a legitimate source. So it was a chain of custody argument. Let me go to what's really bothering me about the permitting. Similar to registration of gifting. Let me go to what's bothering me about the permitting argument. As I read your briefs, basically what you're saying is that we ought to somehow, through this opinion, rewrite the regulatory scheme that Congress and the Fish and Wildlife Service have previously erected and allow them access to the repository, which presumably would mean notwithstanding the fact that they're not a recognized member of a federally recognized tribe, they get a permit that allows them access to feathers. That then raises the argument, or confronts the argument the government has posed of what happens under RFRA when an accommodation, if I can use that term, for one religious practice intrudes upon the ability of other recognized Indian tribes who also need the feathers and the supply is not sufficient for the demand, so that now we're burdening somebody else's religious practices in order to accommodate your clients. Well, it seems to me that the question of limited is almost a self-fulfilling prophecy. If the government has essentially taken all the birds, they take the right to have them all, and the right to have all the feathers, and then to dole them out. But if their system is as deficient as it is, whereas they are not improving their collection efforts, where even though the bird has rebounded in this tremendous way, there doesn't appear to be the same rebound in terms of incoming feathers or birds of the repository, which suggests by its very nature that they're not putting much attention in it or they're not improving their efforts consistent with the bird. But you don't want us to enter an injunction to tell the Fish and Wildlife Service to do a better job of running their collection efforts. No, but I think it cuts against the idea that it's the least restrictive means in saying we have to do this because of the limited supply. It's almost like they're equating limited with fixed, and I think the evidence is quite to the contrary. If they can't get the feathers from a repository, then they're going to have to get them from other sources, which presumably would be from the wild. Well, one of my points is that the system already is set up to accommodate exceptions. There's exceptions. Even though the bird was in a devastating place in 1963, the system still thought it could withstand giving them to Native Americans, right? But at that time, the source to the repository was from the field. Fish and Game Wardens would send in the carcasses of eagles that were struck power lines or were shot in poaching cases, and that's how the repository got its supply. And granted, it wasn't very many, and even today it's only about 1,000 carcasses a year, but that's still not enough to meet the existing demand without regard to trying to accommodate your clients and others who are not otherwise eligible. But the analysis of the severity of the problem is a fallacy when that supply and the limited nature of it is generated by the government's own conduct. It seems to me that if we're going to analyze the burden and the weight of the burden against a very, very substantial right, then we should look at how a couple things. How there are many exceptions already built in the statute or in the regulatory scheme. It's clearly capable of another exception. If there's an exception for scientists and an exception for educators, there clearly can be an exception for sincere practitioners who come into them legitimately, say from a gift process. Those are five, as I read the record in this case, there are five instances over a multi-year period where the repository supplied either whole carcasses or parts of eagles to non-religious American Indians. But the idea is giving those away also added to the delay, right? It also put someone one back in line. And what I'm saying is that the government is overstating the idea of overwhelming demand or severe delay. In one part, they're overstating it by using numbers that only apply to whole birds. These two men who were practicing their religion possessed individual feathers. They don't even keep track of how many individual feathers come into the repository. Before 2001, they didn't even count them. But it still takes them, does it not, 60 to 90 days to fill the demand even for feathers because they don't have enough to fill them immediately? That's the number Fish and Wildlife gave, but it's also tied into the non-improved collection efforts. And there's evidence in the record from the scientists from Mr. Walton's declaration that very easy things could be done to improve that supply. For instance, he's a person who's out in the wild all the time who comes across birds. How do we get around the case law that says that notwithstanding a RFRA violation, the government should not be in the business of affirmatively aiding religious groups? In other words, we can't use the resources of the federal government to make it easier on a particular religious practitioner. Are you really asking for the expenditure of tax money in order to promote religion? My argument really addresses why I think it's a fallacy for the court to have found essentially a fixed supply and an overwhelming demand and therefore find it was the least restrictive means. Factually, I think it's just not true. With respect to what I'm asking for, I'm asking you to find that accommodating these two and allowing them to have their feathers and to vacate their convictions is not the least restrictive means of accomplishing the purpose because there are numerous other exceptions. Also, I really have four reasons that the regulatory system shows it's capable of accommodating other persons, those other categories I talked about. That Ocentro changes the analysis or doesn't change it but essentially reaffirms in an 8 to nothing decision that the courts and the judicial analysis should apply to the particular persons in a particular context and analyze not the question of the effect on opening up the whole repository but the question of what would the effect be of accommodating these two. What I don't quite understand is what is the special quality possessed by these two that would render them eligible to receive, to get these feathers but wouldn't a lot of other people. What is it about them? I think very few people would be able to meet this standard. They are Native Americans, although not on the list. They are sincere practitioners. In fact, it's undenied they're both very high in their churches and both possess the feathers for use in religious ceremonies. They are persons who the record shows came into possession of the feathers in a legitimate way, meaning they were passed down through the church. They were gifted to them. They could establish a chain of custody. If there was a regulation or if there was an exception that said you should register your possession of feathers, even if you're not a Native American, we'll allow the possession of them and it won't be criminal if they're registered. It would be much like the process now where a Native American on the list is asked to register a feather that was passed down to the person. It's the kind of characteristics that could be proven by documentation and paperwork. It was easy in this case for the analysis to be made of whether there was sincerity and the purpose of the possession. Those questions are already being answered in the permit process, so it's clearly something the agency is used to doing, can do, and has been familiar for many years with reviewing this kind of documentation. There's no evidence in the record from the government, and I would say since it's their burden, I would think it's their burden to have produced it to show that there would be some sort of floodgates. I mean, this kind of argument is always made that it's like, oh, if you open it up and let one in, the sky's going to fall. But there's no evidence in the record to indicate that there's some massive number of people that would have such a dire effect. Okay, so they're sincere and they receive these through a church, is that through a religious ceremony of some sort? Right. Okay. You have about a minute left if you want to reserve some time. I'd like to save it if I can to respond to anything. Okay. May it please the Court, Robert Lundman representing the United States. I'd like to pick up just where counsel left off with the question of whether it would be possible to accommodate just these two defendants. I think Ocentro is clear on this point, Wisconsin v. Yoder is clear on this point, many cases are clear on this point, that the issue isn't simply the individuals but similarly situated individuals. And the government runs into equal protection problems if it were to allow just these two defendants to possess eagle feathers, but not to allow similarly situated defendants to possess eagle feathers. Well, they claim that this is not disputed, that this is a religious practice of theirs and that's how they got it. Well, it's not disputed here that there's a substantial burden on their religion. We have not made that argument below. We're not making it here. What is disputed is whether there's a government has a compelling interest and whether it's used the least restrictive means. And the way that this factors into that question is whether when you look at the least restrictive means issue, whether the question is whether just providing it to these, an exception just to these two defendants individually or if you have to provide it to everyone in the same situation. In Wisconsin v. Yoder, the Supreme Court did not look at providing an exception to the individual plaintiffs but rather to the Amish, the similarly situated individuals who faced a similar burden to the plaintiffs there. In Ocentro, the court looked at the entire 130 members of the church that used the hallucinogenic tea to further their religious practice. It wasn't just an individual but rather the entire group that would qualify under an exemption. So I think it's incorrect to say we just look at these two. So the group here would be what? The group here would be anyone with a sincere religious belief, a substantially burdened religious belief, impacted by the government's criminalization of possession of eagle feathers or that are blocked from the repository. There may be an argument that, and I think defendants tried this argument, but I'm not sure if they pursued it all the way, that you could limit that to possibly just participants in Native American religions that are not tribal members. But that then drags in the question of whether that distinction is permissible under Morton v. Mancari and the Rice cases, where the Supreme Court has said that distinctions based on tribal membership survive equal protection review, but if it's based on just Native American-ness as a classification, that might be a problem. So I think the distinction here, the line that would have to be drawn, would open up the repository process and the permit process, not just to these two individuals but to a much larger class. There should be non-registered Native American practitioners of religion. I think it would likely have to be not even just the not Native American, but anyone who has a substantial burden on their religious practice by not having access to eagle feathers. And there are other religious groups in the country that worship eagles or hold eagles in high regards, and they may be dragged in, too. I think the critical point on this, though, is the Antoine case discussed this very issue and said and held that the government's proof here is sufficient, and the government in Antoine and here has shown that the demand for eagles from the repository greatly exceeds supply. And that showing was made in Antoine, and it's the same showing the government has made here, and we don't think there's been any change in circumstances. What do you make of Judge Kaczynski's statement in Antoine that given the fact that the delisting process was not then complete at the time it was decided, that if that delisting occurred, that that might constitute a sufficient enough change to undercut the government's compelling interest argument? I don't think Judge Kaczynski went that far. I think he simply said that it is still just a proposal, and we don't have to analyze whether it's final or not, and that would be a different issue. We're at that different issue now. I don't think he hinted that the result would be different. I think there are a number of reasons why the result should remain the same. The first is, as Your Honor pointed out a few minutes ago, is even though the eagle has technically recovered and is no longer listed under the Endangered Species Act, its recovery cannot be described as complete or completely over. Well, that kind of gets to Judge Goodwin's question, which I'm also concerned about, and that is that how are we as judges supposed to evaluate wildlife biology testimony and make some kind of an intelligent determination that the government's interest is no longer compelling because the species has been delisted, whatever that means, and we don't have to worry about the eagles being extinct anymore? How do we determine that? Do we hold a trial? Do we summon experts on both sides to opine as to the survivability of the species? Do we hold public hearings? Well, I think it's a difficult issue, and it's not one that's well-suited for the judiciary to weigh. It is an expert determination by agency here, and the agency's delisting decision, the decision that announced the eagle will no longer be protected under the Endangered Species Act, is partly based on the protection of the Eagle Act, the very act that the defendants are charged with here. So the expert agency here has explained that it's not just a matter of the Endangered Species Act protections are over and that's the end of the story, but rather those protections are no longer needed, in part because the Eagle Act provides a solid backstop that criminalizes take of eagles, possession of eagles, killing eagles, and that that factored into the agency's decision to delist under the Endangered Species Act. So I think you're right that this is a question, whether the eagle has technically recovered enough to permit an expansion of the permitting process, is a question that in the first instance should be answered by the expert agency, and the expert agency here in the delisting decision cited the protections of the Bald and Golden Eagle Protection Act as critical to delisting. Yeah, it gets to be circular, doesn't it? Well, okay, go ahead. Mr. Lemon, how do you respond to the Supreme Court's statement in Ocentro that basically decries the burden that is placed on the judiciary but says with the existence of RFRA, Congress created this statutory, I guess it's a defense in this particular case to a criminal charge, and like it or not, it's up to the judiciary to handle these issues on a case-by-case basis. Are you evaluating the two-prong test? I think that's right. What I don't think is that Ocentro changes the analysis that this Court set forth in Antwon in any way. The Court there described, and this is a critical difference from Ocentro, that the burden here on religion falls on both sides of the question, so that if you were to shift permit access and repository access, it's not like in Ocentro where you're shifting from away from religious burden to the government's interest in pursuing uniform drug laws. Rather, it's shifting the burden from non-tribal members who don't have repository access to tribal members who face incredibly long waits for eagles because demand still exceeds supply. About that demand exceeding supply point, the wait does vary depending on what it is that a repository permit applicant requests, but for a high-quality eagle feather order, that's a six-month wait. For the 20 miscellaneous feathers that are of lesser quality, that's a 90-day wait. For a whole golden eagle or the equivalent, that's three to three-and-a-half years, and for a bald eagle, it's two to two-and-a-half years. So those waits are all significant, and those waits have impacts as well. The United States v. Friday case, which is an unpublished case coming out of the Tenth Circuit that's now on appeal in the Tenth Circuit, there the district court held that because of those waits, the defendant there, who was a member of a recognized tribe, was justified in shooting one of the very few eagles on his reservation because his religion was burdened, and the repository system wasn't providing an eagle quickly enough to meet his religious needs. So it's not just that they face a wait. That wait is a substantial one, and that wait has its own burden on religious practitioners, and the government here in RFRA here doesn't require the government to shift that burden, as the Antoine Court explains, from some to others. That was good to be in. Thank you. Thank you, Your Honors. Our position is that Antoine and the cases that Antoine also relied on, Hugs and Top Sky, they all predate the delisting, they're not persuasive, and they rest on a premise that doesn't exist anymore. They rest on the premise that the bird was endangered or threatened at the time. That weighed significantly in their finding of compelling interest. This kind of gets back to the question that I asked you earlier. How do we make that determination? Nearly because interior delisted? I mean, you concede, do you not, that the current levels of nesting pairs is much lower than it was at the time that we colonized and populated the country. So at what point do we as judges decide that that's good enough? You know, 10,000 nesting pairs is sufficient for the survival of the species. Well, the Bald and Gold Eagle Protection Act enacted in 1963 was based on the problem with the birds at that time. They weren't talking about 15th century. Nobody had anything to do with original numbers of birds in the country hundreds of years ago. It had to do with an immediate problem that was caused by a reason, DDT, which was eliminated. I can just tell you that in some places people are really worried about the bald eagles. I'm not un-worried about them. I guess. Like in Arizona, we close off portions of the national forest. Okay. Can I just say that our proposal, which is that you allow these sincere practitioners to legitimately possess these gifted feathers, doesn't require access to the entire repository. Understood. Thank you very much. The case just argued is submitted for decision. Before hearing the next cases on the calendar, the court will take a 10-minute recess. All rise. This court is now at a 10-minute recess.
judges: Goodwin, Schroeder, Tallman